**Alexandru DINU, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

**Alexandru Dinu, Petitioner,**

v.

**John Ashcroft, Attorney General, Respondent.**

Nos. 02–74208, 03–72220.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 2004.

Filed June 18, 2004.

Robert B. Jobe, San Francisco, CA, for the petitioner.

Peter D. Keisler, Assistant Attorney General, U.S. Department of Justice, Washington, DC, Richard M. Evans, Assistant Director, U.S. Department of Justice, Washington, DC, Nancy E. Friedman, Office of Immigration Litigation, U.S. Department of Justice, Washington, DC, and Patricia Smith, U.S. Department of Justice, Washington, DC, for the respondent.

Before: WALLACE, KOZINSKI and THOMAS, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider whether police harassment which includes threats of prosecution, but where no charges are brought, must be deemed harassment "on account of ... political opinion" for purposes of the asylum statute.

## Facts

Alexandru Dinu is a native and citizen of Romania. In 1989, when Dinu was twenty-one, he began a year of compulsory military service. During his tour of duty, he was assigned to a unit that specialized in protecting important targets from terrorist attacks. As Dinu's military service neared its end, Romania experienced a revolution, which resulted in the overthrow of Romania's communist regime. Dinu continued his military service during the revolution and returned to his hometown, Craiova City, some weeks thereafter.

In 1991, Dinu was arrested and taken to the local police station. According to Dinu, the police tried to force him to sign a false confession that he had been stationed in Craiova City during the revolution and had fired on demonstrators. According to Dinu, he was never stationed in Craiova City during his military service but had spent the entire time in Tîrgu Jiu, approximately 100 kilometers away. Dinu alleges that, during his detention, he was denied an attorney, beaten and threatened with death if he did not sign the confession.

The police eventually released Dinu, but re-arrested and interrogated him nearly every month following his release. During each detention, Dinu was beaten and threatened. One time, the beating was so severe as to leave a scar on his face. He never reported the abuse to Romanian authorities for fear of retaliation. Dinu made several unsuccessful attempts to leave Romania by going illegally into adjoining countries like Hungary and Bulgaria, and eventually managed to leave Romania permanently in 1994.

After being denied asylum in Austria, Greece and Germany, Dinu eventually made his way to this country, where he was admitted as a visitor. Three weeks after his arrival, he submitted an asylum application and the INS commenced deportation proceedings against him. Before an Immigration Judge ("IJ"), Dinu conceded deportability and renewed his applications for asylum and withholding of deportation. The IJ found Dinu's testimony credible, but denied his petition after concluding that he had not been persecuted "on account of ... political opinion." The IJ also found that country conditions in Romania had changed sufficiently so that Dinu could return without fear of persecution. The Board of Immigration Appeals ("BIA") summarily affirmed.

## Analysis

**1.** To qualify for asylum, Dinu was required to show that he is "unable or unwilling to return to ... [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). We focus here on whether the Romanian authorities' mistreatment of Dinu was "on account of" one of the grounds provided in the statute. We do not decide whether the mistreatment rose to the level of "persecution." The IJ found that Dinu had "testified credibly," A.R. at 194, but had failed to demonstrate that "the authorities' interest in him .... was on account of political opinion or any other protected ground." *Id.* at 196. "At best," the IJ continued, "he has shown heavy-handed enforcement by Romanian authorities for military or potentially criminal violations, if in fact the charges against him were found to be true. He has also shown a failure of the justice system to protect him from abuses of legal process in investigating those charges." *Id.* at 196–97. In other words, the IJ believed Dinu's story that he was treated badly by Romanian authorities, but refused to infer that this ill treatment was on account of one of the reasons listed in the asylum statute.

Dinu argues that the harassment he suffered was on account of imputed political opinion. The Romanian authorities were harassing him, he claims, because he had served in one of the military units whose mission it was, inter alia, to protect the deposed president. A.R. at 222. According to Dinu, Romanian police falsely inferred that he had supported the hated dictator and his policies, and that's the real reason they were harassing him.

Dinu presents no direct evidence of this—not even a hearsay report that any of the police ever intimated this as the reason for his harassment during the many contacts they had with him. He relies, rather, on some of our cases which hold that "[i]f 'there is no evidence of a legitimate prosecutorial purpose for a government's harassment of a person ... there arises a presumption that the motive for harassment is political.'" *Navas v. INS,* 217 F.3d 646, 660 (9th Cir.2000) (quoting *Singh v. Ilchert,* 63 F.3d 1501, 1509 (9th Cir.1995)); *see also Hernandez–Ortiz v. INS,* 777 F.2d 509, 516(9th Cir.1985) ("When a government exerts its military strength against an individual or a group within its population and there is no reason to believe that the individual or group has engaged in any criminal activity or other conduct that would provide a legitimate basis for governmental action, the most reasonable presumption is that the government's actions are politically motivated."). According to Dinu, since the Romanian police never charged him with a crime, they must have had no legitimate reason for harassing him, and this gives rise to an inference of political persecution.

 Dinu reads our cases too broadly. We certainly have never held that if police don't charge someone with a crime this will automatically raise a presumption of political persecution. The presumption arises only "where there appears to be no other logical reason for the persecution at issue." *Navas,* 217 F.3d at 657(citing *Sangha v. INS,* 103 F.3d 1482, 1490 (9th Cir. 1997)). As we know from our own experience, criminal investigations often can take months or even years to complete, and may involve repeated contacts by the police with suspects and witnesses. The length of time an investigation is ongoing does not alone raise a presumption of political persecution, though protracted delay can certainly be taken into account. Nor is any other factor conclusive. The question is whether petitioner has borne his burden of showing that the purported criminal investigation had no bona fide objective, so that political persecution must have been the real reason for it.

Here, petitioner has not borne his burden. Indeed, his own testimony supports the IJ's finding that the interrogation tactics employed by the Romanian police, albeit heavy-handed and inconsistent with what we would find acceptable, were nevertheless directed at the legitimate goal of finding evidence of crime rather than the illegitimate one of harassing a political opponent. As Dinu acknowledges, the shooting of civilians by the military during the uprising in various parts of Romania, including Craiova City, was a major event during the revolution, and there were widespread calls throughout the country for the apprehension and punishment of those responsible. Suspicion naturally fell on those who served in the military, and particularly on low-level officers who might have given the order to open fire. Dinu was a non-commissioned officer, though he claims that his unit was not in Craiova at the time of the shootings, and so he could not have participated. When asked why the police had selected him for harassment, however, he forthrightly acknowledged: "I guess they were looking for, for people that were guilty. They were charging me with things I didn't do, just because they had to justify that they,

they found the guilty ones. They had to show the government that they did their job." A.R. at 222. He further explained that "it was publicly known that the authorities concluded that the security units in those times were responsible for shooting in the people, so everybody, everybody believed that it was the security units that shot the demonstrators, and they were trying to find a guilty party." *Id.* at 232. When asked why he, a mere corporal, was selected, he responded:

> The, the, the way the things went at the time, it was—everybody was questioning, trying to find a guilty party. The higher ranking officers had connections that sometimes helped them in those situations, but it was the soldiers that were known to, to have shot the demonstrators in other cities, so they were trying to find anybody that could be considered guilty.

*Id.* at 233. This is quite different from cases like *Hernandez–Ortiz* where the only plausible explanation for the multiple incidents of violence against petitioner and her family was her imputed opposition to the government. *See Hernandez–Ortiz,* 777 F.2d at 516–17.

■ Dinu argues that, since the IJ found him credible, we are bound to assume he is innocent of the crime of shooting the demonstrators, and must infer political persecution from the fact that the Romanian police were harassing an innocent man. But being innocent provides no immunity from police investigation any more than being guilty justifies unsavory police tactics. Police investigating a crime are not bound to believe the protestations of innocence of various suspects, even if those protestations are, in fact, truthful. Police are entitled to be skeptical and keep probing for evidence, and that process can sometimes take a very long time. So long as the police are trying to find evidence of criminal activity, neither the length of the investigation, nor the fact that they are pursuing suspects we believe to be innocent, nor the unsavoriness of their tactics, gives rise to an inference of political persecution. It is only "where there appears to be no other logical reason for the persecution at issue," *Navas,* 217 F.3d at 657, that the IJ may draw the inference that the police investigation is a subterfuge for political harassment. Here, the record discloses an alternative explanation—Dinu himself offered such reasons in his testimony. We therefore affirm the BIA's decision denying Dinu's request for asylum.

■ **2.** To qualify for withholding of deportation, an applicant must show that, if he is returned to his country, his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The standard of proof for withholding of deportation is stricter than for asylum. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Having been found ineligible for asylum, Dinu cannot meet this burden.

**PETITION DENIED.**

THOMAS, Circuit Judge, dissenting:

I respectfully dissent.

Although ordinary prosecution for criminal activity is not considered persecution under asylum law, *see Chanco v. INS,* 82 F.3d 298, 302 (9th Cir.1996), if the petitioner was not the target of any "legitimate government prosecution," the petitioner is entitled to a presumption that at least one of the motives for the harassment is political. *Singh v. Ilchert,* 63 F.3d 1501, 1509 (9th Cir.1995); *see also Blanco–Lopez v. INS,* 858 F.2d 531, 534 (9th Cir.1988); *Ratnam v. INS,* 154 F.3d 990, 993–94 (9th Cir.1998).

In this case, the petitioner was taken into police custody every month for an extended period of time, beaten, and threatened with death if he did not sign a false confession. He claims, without contradiction, that these beatings were motivated by a desire on the part of the police to discredit the former Ceausescu regime by trying to "find guilty people or invent them so the communists can justify their overthrow of the former president." As Dinu explained on his original application for asylum:

> After the revolution it had been decided by current Romanian authorities that the "Securitate" helped the former President Ceausescu and was against the revolutionaries. So, because I was part of Securitate unit they tried to find me guilty of crimes that others have committed.

The immigration judge speculated that this was mere heavy-handed, but legitimate, law enforcement. A close examination of the record belies this and demonstrates that the petition was entitled to the presumption that at least one of the motives for the beatings, threats, and interrogation was political. Specifically, the record reflects that:

- Dinu's arrests and detentions began on the heels of one of the most momentous political upheavals in modern Romanian history.
- Dinu was conscripted involuntarily into the Securitate, which was the security force most closely associated with the deposed and murdered Ceausescu (although Dinu was never assigned to guard Ceausescu).
- The shootings took place in Craiova, yet Dinu's unit was never stationed in that city.
- The police arrived at Dinu's house in the middle of the night to arrest him, detain him, and beat him.

- Dinu was never formally charged by the police with a crime.
- Although, according to the State Department country report, the Penal Code requires that authorities inform arrestees of their right to an attorney at all stages of the legal process, and requires an attorney be appointed for indigent defendants, Dinu's request to have a lawyer present at his interrogations was refused.
- The police repeatedly tried to force him to sign a prepared confession.
- The police threatened his life, and told him they would kill him if he reported their actions to anyone.
- Dinu retained a permanent scar on his face from the beatings.
- Dinu was finally released, only to be subjected to the same treatment every month or so, for more than a year.

In short, Dinu had an alibi to the accusations that could be easily verified by the authorities, yet he was repeatedly interrogated, beaten, and threatened with death over a lengthy period—more than a year. There is no explanation in the immigration judge's opinion, nor is one offered by the government, as to why a legitimate law enforcement investigation would continue after the suspect produces a verifiable and unchallenged alibi. The failure to adhere to the procedures required by applicable law is also significant. One cannot say that refusing access to an attorney when one is requested and threatening to kill a defendant if he reports police actions constitute recognized hallmarks of legitimate law enforcement. Nor does the administration of repeated beatings over many months. Given the disregard of legal process, the absence of charges is significant. Dinu was entitled to the presumption that at least part of the motive for the persecu-

tion was political. A contrary conclusion cannot be squared with our case law.

The immigration judge also failed to conduct a proper mixed-motive analysis. As we observed in *Singh,* "[p]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied." 63 F.3d at 1509–10. Here, the immigration judge assumed a legitimate law enforcement motive, and did not analyze whether the petitioner had "produce[d] evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground." *Borja v. INS,* 175 F.3d 732, 736 (9th Cir.1999) (en banc) (quoting *In re T–M–B,* Interim Dec. No. 3307, 1997 WL 80988 (BIA Feb. 20, 1997)).

In sum, the immigration judge failed to apply the presumption that the motive for persecution is political in the absence of a legitimate government prosecution and further failed to apply the proper mixed-motive analysis. I would grant the petition for review.