**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KAMALPAL SINGH,<br>*Petitioner*,<br><br>v.<br><br>ERIC H. HOLDER, JR., Attorney General,<br>*Respondent*. | No. 10-71677<br><br>Agency No.<br>A094-990-061<br><br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted February 13, 2014[*]
San Francisco, California

Filed August 26, 2014

Before: Stephen Reinhardt and Sidney R. Thomas, Circuit
Judges, and Lloyd D. George, Senior District Judge.[**]

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge George

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Lloyd D. George, Senior District Judge for the U.S. District Court for the District of Nevada, sitting by designation.

## SUMMARY[***]

### Immigration

The panel granted a petition for review of the Board of Immigration Appeals' denial of asylum and withholding of removal to a citizen of India who asserted claims for past persecution and a fear of future persecution by police on account of his imputed political opinion.

The panel held that the evidence compelled the conclusion that petitioner's imputed political opinion was at least one central reason police targeted him where during interrogation police called him a traitor and repeatedly accused him of working against the government.

The panel further held that indirect evidence of petitioner's association with a suspected terrorist supported the conclusion that he was persecuted because of an imputed political opinion. The panel explained that although the REAL ID Act eliminated the presumption that persecution is politically motivated in the absence of any evidence of a legitimate prosecutorial purpose, an applicant may still meet his burden of establishing nexus by introducing evidence that he was wrongly accused of being a terrorist.

The panel held that mixed-motives analysis applies to cases governed by the REAL ID Act, and that even if police are engaged in a legitimate investigation, an applicant may establish nexus by showing that he was persecuted both

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

because of legitimate investigatory reasons and because of a protected ground, so long as a protected ground was at least one central reason for the harm.

District Judge George concurred with the opinion insofar as it remanded for the granting of relief pursuant to the Convention Against Torture. Judge George dissented from the majority's holding that the evidence compels the conclusion that a central reason for petitioner's persecution was an imputed political opinion. George wrote that he believes that the evidence, both direct and circumstantial, shows that the reason police targeted petitioner was an effort only to obtain information about a suspected terrorist.

## COUNSEL

Pardeep Singh Grewal, Law Office of Pardeep Singh Grewal, Castro Valley, California, for Petitioner.

Tony West, Assistant Attorney General; James E. Grimes, Senior Litigation Counsel; and Janice K. Redfern, Senior Litigation Counsel, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

**OPINION**

REINHARDT, Circuit Judge:

Kamalpal Singh, a 51-year-old native and citizen of India, petitions for review from the BIA's denial of his application for asylum and withholding of removal based on imputed political opinion. Singh entered the United States in 2006 after fleeing egregious physical abuse by the local police in his town of Jullandar in the state of Punjab. Although the BIA affirmed the immigration judge's (IJ) decision to grant Singh relief under the Convention Against Torture (CAT), it held that an imputed political opinion was not a central reason for the police brutality against him and denied his applications for asylum and withholding of removal. Relying in part on our decision in *Dinu v. Ashcroft*, 372 F.3d 1041 (9th Cir. 2004), the BIA concluded that the Punjabi police had legitimate reasons for their arrest and detention of Singh. The government did not contest the IJ's decision to grant Singh relief under CAT, and the BIA, accordingly, affirmed this portion of the IJ's decision. We grant Singh's petition and hold that the record compels the conclusion that Singh is eligible for asylum and entitled to withholding of removal.

**I.**

Singh's troubles began shortly after his domestic servant, Jabed Khan, left for vacation and failed to return. After being introduced to Khan by a friend's servant, Singh hired Khan to perform various domestic tasks, including caring for Singh's mother, taking his children to school, running errands, and cooking for the family. Singh testified at his hearing that Khan was "a very nice man," who "never abused anyone, [and] never used bad language." Singh also testified that

Khan received visitors who appeared to be Khan's friends and relatives from his home state of Jammu and Kashmir. In addition to these visits, Khan occasionally used his vacation from work to visit his village for periods of a week to ten days. After two years of employment with Singh, however, Khan left for vacation and never returned.

Shortly after Khan's departure in May 2006, the police came to Singh's home and arrested him at around 4:30 in the morning. Four police officers took him to the police station and detained him for two days. They interrogated him about Khan, and told him that Khan was a Kashmiri terrorist. They then accused Singh of helping the terrorists and of knowingly employing Khan despite his connections to terrorism. They asked Singh what terrorist activities were being planned and accused him of being a "traitor" who was "working against the government."

The police did not limit themselves to questioning, however. During the course of the interrogation, Singh was repeatedly subjected to egregious physical abuse. One officer grabbed his hair and struck him repeatedly in the face. The other officers then pushed him to the ground while one held his hands together and another restrained him by placing his knee on Singh's neck. At the same time, another officer beat Singh with a bamboo stick and leather belt. The police beat him for ten to fifteen minutes at a time and then continued interrogating him. When Singh apparently persuaded them that he had no information to offer them, the officers stripped his pants off and used them as a pulley by which they hung him upside down until he lost consciousness. The police then alternated between hanging Singh upside down and beating him. He was beaten about five or six times during the course of his two-day detention.

Following the physical abuse and the extended questioning, the officers refused to let Singh go, and he was released only when his family and neighbors bribed them with 50,000 rupees.[1]  The officers warned Singh not to talk about what had happened at the station.  Once he was released, he was not able to walk because of the beatings and he had to seek medical attention.  Singh's doctor feared reprisal by the police, however, and refused to treat him at the hospital, instead going to Singh's house to provide medical care.

A few weeks later, at four in the morning, the police returned to Singh's home and arrested him a second time. The four officers began asking him about Khan again, and he told them that he had already given them all the information he had.  The chief police officer slapped Singh and told the other officers to take him to the station to "make a man out of him there."  He was taken to the interrogation room, thrown on the ground, and beaten while the officers asked him questions about Khan's whereabouts, his knowledge of terrorist activities, and his own role in assisting the terrorists. When he told the officers that he did not know anything, they threatened to kill him if he refused to answer.  The officers again put Singh on the ground and beat him with a bamboo stick and leather belt.  Over the course of his four days in detention, Singh was beaten eight to ten times.  This time, Singh's family bribed the officers with 80,000 rupees in order

---

[1] In 2006, 50,000 rupees was the equivalent of approximately $1,100. At the time, Singh's yearly salary appears to have been around 95,000 rupees.

to obtain his release.[2]  Shortly after his second arrest and beatings, Singh fled to the United States.

During his hearing before the IJ, Singh testified that he feared returning to India because the police continued to look for him and to harass his family.  Singh stated that the police went to his home 12 to 13 times after his departure for the United States.  Once Singh had fled, the police targeted his wife, Sarpreet Kaur.  They arrested her, took her to the police station, detained her for the night, and beat her.  They asked her about Singh's whereabouts and about his activities against the government.  Singh's family and neighbors bribed the police to have his wife released, this time paying 20,000 rupees.[3]

The facts described above are contained in Singh's testimony before the IJ, who found his testimony to be credible.  Nonetheless, the IJ denied Singh's request for asylum and withholding of removal, because he concluded that Singh had not demonstrated a nexus between his persecution and a protected ground.[4]  Relatedly, the IJ found that it was more likely than not that Singh would be tortured if returned to India and therefore granted his request for relief under CAT.

---

[2] In 2006, 80,000 rupees was the equivalent of approximately $1,750.

[3] In 2006, 20,000 rupees was the equivalent of approximately $440.

[4] Singh originally claimed that he had been persecuted on account of his religion, his membership in a particular social group, and an imputed political opinion.  His petition for review concerns only his claim of an imputed political opinion.

The BIA agreed with the IJ and affirmed his ruling that Singh had not established that an imputed political opinion was a central reason for his persecution by the Punjabi police. Relying in part on our decision in *Dinu v. Ashcroft*, the BIA held that the Indian government had a "legitimate reason to arrest, detain, and question" Singh, and that he was therefore ineligible for asylum. The government did not appeal the IJ's determination that Singh was entitled to relief under CAT, and the BIA affirmed the portion of the IJ's decision granting such relief. Singh filed a timely petition for review.

## II.

We have jurisdiction over Singh's petition for review under 8 U.S.C. § 1252. We review the denial of asylum or withholding of removal for substantial evidence. *Kumar v. Gonzales*, 444 F.3d 1043, 1049 (9th Cir. 2006). "Under that standard, the BIA's determination must be upheld if it is supported by reasonable, substantial and probative evidence from the record." *Id.* Where, as here, the BIA adopts the reasoning of the IJ and adds additional reasons, we review both decisions. *Lopez-Cardona v. Holder*, 662 F.3d 1110, 1111 (9th Cir. 2011).

## A.

"It is settled law that an applicant may establish a political opinion for purposes of asylum relief by showing an 'imputed political opinion.'" *Kumar*, 444 F.3d at 1053 (citation omitted). To demonstrate a nexus between Singh's mistreatment and an imputed political opinion, Singh "must show (1) that . . . his persecutors believed that he held . . . a political opinion; and (2) that he was harmed because of that political opinion." *Baghdasaryan v. Holder*, 592 F.3d 1018,

1023 (9th Cir. 2010). Singh's asylum application was submitted after the enactment of the REAL ID Act, and he must therefore demonstrate that an imputed political opinion was "at least one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i); *see also Parussimova v. Mukasey*, 555 F.3d 734, 740 (9th Cir. 2008). Because the IJ and the BIA determined that Singh's testimony was credible, we treat the facts to which he testified as true. *See Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011).

The Punjabi police attributed a political opinion to Singh during their interrogation and abuse of him. Testimony regarding a persecutor's statements serves as direct evidence that the persecution was motivated by a political opinion imputed to the applicant. *See Hu v. Holder*, 652 F.3d 1011, 1017–18 (9th Cir. 2011); *see also Li v. Holder*, 559 F.3d 1096, 1111–12 (9th Cir. 2009) ("Persecutors' motivation should not be questioned when the persecutors specifically articulate their reason for attacking a victim."). The police called Singh a "traitor" and repeatedly accused him of "working against the government." Even after Singh departed, the police continued to attribute a political opinion to him in their statements. Singh testified that the police told his wife that Singh was a "dog" and asked her about his "activities against the government." Such accusations of "acting against the government" constitute an imputed political opinion. *See Hu*, 652 F.3d at 1017–18. Because the inquiry in an imputed political opinion case focuses on the views of the persecutor, *Garcia-Milian v. Holder*, No. 09-71461, 2014 WL 555138, at *3 (9th Cir. Feb. 13, 2014), Singh's credible testimony regarding the police officers' statements about him persuasively demonstrates that a central motive for persecuting him was that they believed that he opposed the government.

In addition to the direct evidence of his persecutors'
statements, the indirect evidence supports Singh's testimony
that he was persecuted because of an imputed political
opinion. Singh testified that the Indian police were interested
in him because of his relationship to Khan, his domestic
servant. An "applicant's association with, or relationship to,
people who are known to hold a particular political opinion"
may serve as indirect evidence of an imputed political
opinion. *Garcia-Milian*, 2014 WL 555138, at \*3 (quoting
*Navas v. INS*, 217 F.3d 646, 658 (9th Cir. 2000)) (internal
quotation mark omitted). That appears to be precisely the
case here. The Punjabi police asserted that Singh was a
"traitor" based solely on his association with Khan, a reason
we have repeatedly held to support the conclusion that a
political opinion has been imputed to the applicant. *See, e.g.*,
*Silaya v. Mukasey*, 524 F.3d 1066, 1070–72 (9th Cir. 2008)
(holding that persecutors' statements indicating that they had
chosen her because of her father's relationship to the
Philippine government constituted persecution on account of
an imputed political opinion). The police targeted Singh and
imputed antigovernment views to him because of his
relationship with another individual who they considered held
antigovernment political beliefs.

Yet, under the facts determined to be true by the IJ and
affirmed as such by the BIA, Singh was not a terrorist, nor
did he engage in antigovernment activities. He testified that
he had no association with terrorists and did not participate in
any such activity. He also stated that he did not know
anything about Khan or have any information regarding
Khan's involvement with terrorist activities. Taking Singh's
testimony as true, as we must, Singh was falsely accused of
being a terrorist and holding antigovernment views because
of his association with Khan. The Punjabi police beat him

and hung him upside down until he lost consciousness because they imputed Khan's alleged political beliefs to him. Under our cases, this constitutes a nexus to a protected ground. *See Kumar*, 444 F.3d at 1053–54. Indeed, Singh independently meets the causal burden imposed by the REAL ID Act: "[T]o demonstrate that a protected ground was 'at least one central reason' for persecution, an applicant must prove that such ground was a cause of the persecutor's acts." *Parussimova*, 555 F.3d at 741.

Our conclusion that the Punjabi police's mistaken belief that Singh was a terrorist constitutes an imputed political opinion is supported by the legislative history of the REAL ID Act. The Act requires asylum applicants to demonstrate that the protected ground is "at least one central reason" for the persecution. *Id.* at 740. As the BIA has noted, Congress intended this amendment to eliminate the *presumption* previously applied by our court that persecution is politically motivated in the absence of any evidence of a legitimate prosecutorial purpose. *See In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 214 n.9 (BIA 2007). The elimination of the presumption restored the law to its prior state: the burden is on the asylum applicant to offer evidence as to the persecutor's motive.

Although the REAL ID Act was intended to overrule our "presumption," it affirmed our prior imputed political opinion cases in an important respect. We had previously held that persecution based on the mistaken belief that the individual is a terrorist is persecution on account of an imputed political opinion. *See, e.g.*, *Kumar*, 444 F.3d at 1054. In explaining its new standard, Congress explicitly reiterated that an applicant sufficiently shows a nexus to a protected ground when he provides evidence that law enforcement mistakenly

believes him to be a terrorist. In explaining the effect of eliminating the presumption that persecution is the result of political opinion when there is no evidence as to the reason for the punitive treatment, Congress stated:

> The "central reason" standard will eliminate this presumption, and require aliens who allege persecution because they have been erroneously identified as terrorists to bear the same burden as all other asylum applicants, that is, they will have to offer direct or circumstantial evidence of motive, in accordance with Supreme Court precedent.

H.R. Rep. No. 109-72, at 165 (2005). Thus, the difference under the REAL ID Act is that an applicant must now introduce evidence to demonstrate that he was wrongly accused of being a terrorist instead of relying on a presumption that he was persecuted on account of a political opinion when no evidence as to motive is presented. The House Report accompanying the REAL ID Act makes clear that, as long as the applicant meets his evidentiary burden, the mistaken belief that an individual is a terrorist constitutes a nexus to an imputed political opinion. As we have explained, in light of the IJ's credibility finding, we take as true Singh's testimony that he was not associated with terrorists and had not engaged in any terrorist activities. We also take as true his testimony that his persecutors wrongly accused him of working against the government and being associated with terrorists. Thus, under the standard approved by Congress in the REAL ID Act, Singh has demonstrated a nexus to an imputed political opinion.

Our decision in *Dinu v. Ashcroft* is not to the contrary, and the IJ and BIA's reliance on that decision is misplaced. The facts and circumstances in *Dinu* are far different and of no relevance here. Dinu, who served in the military during the Romanian revolution, was arrested and investigated for his role in the massacre of civilians. 372 F.3d at 1044. He had been a member of a special security unit widely suspected of participating in the murders, which occurred in his hometown. *Id.* Dinu himself explained the justification for the Romanian investigation of him: he testified that "it was publicly known that the authorities concluded that the security units in those times were responsible for shooting in the people, so everybody, everybody believed that it was the security units that shot the demonstrators, and they were trying to find a guilty party." *Id.* at 1045. Finally, Dinu offered no direct, or even indirect, evidence that his persecution was anything but a criminal investigation or that it was on account of an imputed political opinion. *Id.* at 1044–45.

Here, Singh has presented direct evidence that he was arrested and severely beaten on account of the political beliefs that the Punjabi police imputed to him, and there is no evidence that any investigation of him was conducted for any other reason. The only connection between Singh and any possible wrongdoing was the mistaken belief that because he hired Khan as a servant, he must be a terrorist. Because Singh has presented direct evidence that the Punjabi police mistakenly believed him to be a terrorist, and there is no evidence that Singh was the subject of a legitimate

investigation based on other grounds, *Dinu*'s holding is of no relevance here.**5**

   In sum, *Dinu* does not control this case.**6**   *Dinu* is of little value in assessing asylum claims based on imputed political opinion. It applies only to cases in which an asylum applicant is the subject of a legitimate law enforcement investigation and offers no direct or indirect evidence that he is being

---

**5** The government also relies on *Sharma v. Holder*, 633 F.3d 865 (9th Cir. 2011).  That case is not controlling here for the same reason that *Dinu* does not control.  In *Sharma*, the court stated that "the motivation of the police was clear: stop Sharma's father from publishing his book.  The police never inquired into Sharma's own political views.  When they picked him up, their sole inquiry pertained to the status of his father's book."  663 F.3d at 870.  Moreover, the court dismissed Sharma's contentions that the police imputed his father's beliefs to him as "isolated" and "hearsay," and thus entitled to "less weight than the other evidence in the record."  *Id.* at 877 & n.1.  Here, in contrast, the IJ found Singh's testimony and his application as a whole to be credible, and the references to Singh's own political opinion were far from isolated; the police repeatedly asked Singh, and later his wife, about Singh's own work against the government.  The BIA also relied on its own decision in *Matter of R-O-*, 20 I. & N. Dec. 455 (BIA).  In *Matter of R-O-*, however, the BIA again ultimately concluded that "there is no evidence that the respondent has received any threats from the Government on the grounds of political opinion . . . ."  *Id.* at 459.

**6** Although we have stated that a lack of proper procedures and the use of torture may render law enforcement activities illegitimate, we need not consider those questions here.  *See Li*, 559 F.3d at 1109 (lack of proper procedures); *Nuru v. Gonzales*, 404 F.3d 1207, 1223–24 (9th Cir. 2005) (torture).  Nor need we consider that *Dinu* was a pre-REAL ID Act case while this case is post-REAL ID.  Instead, what matters is that in *Dinu* there was no evidence that the asylum seeker was beaten on account of his political opinion while the evidence is unrefuted that such was the cause of the brutal physical assaults on Singh.

subjected to harsh treatment on account of a protected ground.

Although there is little if any evidence that the police in Singh's case were engaged in a legitimate investigation, even if the investigation were legitimate, Singh could establish a nexus in this case. We have held that, under the REAL ID Act's standard, a persecutor may be motivated by more than one central reason, and "an asylum applicant need not prove which reason was dominant." *Parussimova*, 555 F.3d at 741 (9th Cir. 2009). Because mixed motive analysis exists in cases governed by the REAL ID Act, a petitioner may have been persecuted both because of legitimate investigatory reasons *and* because of his political opinion (imputed or actual), his religion, or other protected ground. The dissent seemingly fails to grasp this point.[7] In short, even if a petitioner's persecution occurs during the course of a legitimate investigation or prosecution, neither *Dinu* nor any of our other cases requires that the BIA or our court ignore direct or indirect evidence that a persecutor was also

---

[7] Contrary to the dissent, we hold that irrespective of any other reason for the police's persecution of Singh, the evidence compels the conclusion that one central reason for the persecution in this case was the belief on the part of the police that Singh held an antigovernment political opinion. That is the only reasonable justification for why the police called him a "traitor," accused him of "working against the government," and interrogated his wife regarding his "activities against the government." To the extent that the dissent makes the extraordinary claim that the police could not have imputed a political opinion to Singh because they interrogated him for information about Khan, such a claim is flatly at odds with our precedent. *See, e.g.*, *Kumar*, 444 F.3d at 1047, 1053–54 (finding a nexus to an imputed political opinion in a case in which the officers told the petitioner that "he would be killed if he did not disclose the identities of Muslim terrorists and reveal information about their planned terrorist activities," *id.* at 1047).

motivated to harm the applicant on account of a protected ground. *Cf. Li*, 559 F.3d at 1109 (recognizing that police may be motivated by both "prosecutorial aims and religious hatred" in a pre-REAL ID case). If a petitioner has presented evidence that an imputed political opinion was a central reason for the persecution, as Singh has here, then the fact that the persecution occurred during the course of a legitimate criminal investigation would not preclude eligibility for asylum.

For these reasons, we hold that the evidence compels the conclusion that a central reason for the physical abuse to which Singh was subjected was an imputed political opinion and that he has established a nexus between that abuse and a protected ground.

## B.

Because the evidence compels the conclusion that Singh has established a nexus to a protected ground, the only questions remaining with respect to his asylum claim are whether the egregious physical abuse he experienced rose to the level of persecution and whether he has a well-founded fear of future persecution. Under most circumstances, we would be required to remand the matter to the BIA to make these determinations in the first instance. *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam); *see also Hu*, 652 F.3d at 1020 (remanding because the nexus inquiry and the persecution inquiry are "distinct").

Here, as we held in *Fedunyak v. Gonzales*, 477 F.3d 1126 (9th Cir. 2007), however, the posture of Singh's case renders a remand unnecessary. *Id.* at 1130–31. As in *Fedunyak*, the IJ granted Singh relief under CAT and found that it was more

likely than not that he would be tortured by the government, or with its acquiescence, if he returned to the country he fled. *Id.* The BIA affirmed this finding. The evidence that the IJ weighed to determine that Singh is more likely than not to be subjected to torture upon his return to India is the same evidence that Singh offered to establish his refugee status. Singh has met the high burden of demonstrating that he is likely to be tortured, so he necessarily meets the lower burden for eligibility for asylum that he has a well-founded fear of future persecution. *See Nuru*, 404 F.3d at 1228–29. Having established a nexus between his persecution and an imputed political opinion, and having established a well-founded fear of future persecution, a *Ventura* remand is unnecessary. *Fedunyak*, 477 F.3d at 1130–31. Thus, we remand to the BIA with instructions that the Attorney General exercise his discretion whether to grant asylum under 8 U.S.C. § 1158(b). *Id.* at 1131.

## C.

Singh is also entitled to withholding of removal. In order to establish entitlement to withholding of removal, an applicant must show that it is "more likely than not" that he will be persecuted on account of a protected ground. *Id.* at 1130. The BIA has held that Singh is more likely than not to be tortured if returned to India. Given our holding on the nexus question, Singh has necessarily demonstrated that he is more likely than not to be persecuted on account of an imputed political opinion and is entitled to withholding of removal. *Id.* at 1130–31.

## III.

We conclude that Singh's credible testimony compels the conclusion that an imputed political opinion was a central reason for his persecution by the Punjabi police, and that he has a well-founded fear of future persecution. Accordingly, we remand this case to the BIA with instructions that the Attorney General exercise his discretion whether to grant Singh asylum. We also remand for an order withholding removal of Singh and granting relief under the Convention Against Torture.

The petition for review is **GRANTED and REMANDED** for the purposes described in the above opinion.

GEORGE, Senior District Judge, dissenting in part; concurring in part:

I respectfully dissent from the majority's holding that the evidence compels the conclusion that a central reason for Singh's persecution was an imputed political opinion. The evidence, both direct and circumstantial, shows that the reason for the police's arrest and mistreatment of Singh was an effort only to obtain information about Khan, a suspected terrorist. Singh's own testimony confirmed it. The IJ found that testimony credible, and integrated it into his ruling that Singh had not demonstrated a nexus between the actions of the police and protected political opinion. The BIA concurred with the IJ's determination. Now, the majority rejects it all. I cannot agree to pay lip service to the IJ's credibility determination while at the same time ignoring the record upon which that determination stands.

"To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it," *INS v. Elias-Zacarias*, 502 U.S. 478, 481(1992) (emphasis in original), and that "no reasonable factfinder could fail to find the requisite fear of persecution." *Id*. at 483–84. "The applicant must establish his case by 'credible, direct, and specific evidence' in the record." *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) (citing *Prasad v. INS*, 47 F.3d 336, 338 (9th Cir. 1995) (citation omitted)).

The IJ found that Singh testified credibly. "[W]ithout an adverse credibility finding we accept a petitioner's testimony as credible because '[a]ny other rule would put us in the position of second-guessing the credibility of the petition on appeal when no doubts have been raised by the Immigration Judge or the Board.'" *Canjura-Flores v. INS*, 784 F.2d 885, 888–89 (9th Cir. 1985). We also must consider the record as a whole. *Ratnam v. INS*, 154 F.3d 990, 994 (9th Cir. 1998).

At the removal hearings before the IJ, Singh testified that he "was only arrested because of Jabed Khan and they said he was a terrorist and police alleged that I was helping the terrorists." During examination, the following exchanges also took place:

> [Singh's lawyer to Singh]:
>
> Q: How were you treated [at the time of the second arrest]?
>
> A: Immediately on arrival at the police station, they took me to the interrogation room and they threw me on the ground and started to beat me up and they were

repeating all those four questions all over again. He – they, were asking those questions and I told them that I do not know anything about Jabed Khan and their chief man, he said, beat this, this person again because he's not telling us the truth or he's not coming up with – and then they threatened saying that if you don't answer or give us the information this time, we will kill you.

. . .

Q: Did the police say anything to you besides accusing you of being linked with a terrorist?

A: No, they were – they were focused on asking me about the terrorist and they, they said, how do you help them, tell us all about it. I think because of me being a Sikh, they were, they, were doing that more and more with me.

. . .

[Government lawyer to Singh]:

Q: Okay, sir, I just want to make sure I understand, okay. So the reason the police arrested you is because they want to find out information – one is to find out information about Jabed Khan.

A: Yes.

Q: Okay, and [the] second reason was because they accused you of hiring him even though you know that he's a terrorist?

A: I did not know anything about his being a terrorist and he was not a terrorist.

The IJ found Singh's testimony credible in the following terms:

In assessing the credibility of the respondent, I have taken into account the rationality, internal consistency and inherent persuasiveness of his testimony. In considering the foregoing, I find that the respondent has testified credibly and his application is credible.

In concluding that Singh had failed to factually demonstrate the nexus between his mistreatment and a protected ground, the IJ centered exclusively on Singh's testimony that the police focused on him only because he had hired Jabed Khan and might have information about Khan. He wrote:

[T]he Court noted that [Singh] was asked repeatedly by Government counsel why he was arrested and he consistently answered that he had been arrested because he had employed [Khan].

. . .

> In the Court's view, the record is consistent
> that the police were interested in the
> respondent because of his connection with an
> individual from an area of India where there is
> terrorist activity. The respondent confirmed
> as much in his testimony. . . .

The IJ's credibility determination and his protected-ground analysis are thus intertwined. The majority would pull them apart, and draw our attention away from the actual reason upon which the credibility determination is grounded–that Singh did nothing more than employ Khan to provoke the police's interest. *See Mengping Lu v. Mukasey*, 275 Fed. Appx. 636, 637 n.1, 2008 WL 1817727, at *1 n.1 (9th Cir. April 23, 2008) (citing *Marcos v. Gonzalez*, 410 F.3d 1112, 1116 (9th Cir. 2005) ("Our review [of an IJ's adverse credibility determination] focuses only on the actual reasons relied upon by the IJ")).

*Shoafera v. INS*, 228 F.3d 1070 (9th Cir. 2000), is instructive on the role of uncontroverted testimony and the IJ's credibility determination in establishing the motivation of a persecutor. In that case, Shoafera contended that she was raped by a Tigrean in her Ethiopian community on account of her Amharan ethnicity. Like this case, the IJ had found the alien's testimony credible yet ruled that the alien's claims did not meet the requirements of showing that they were based on a protected ground. *See id.* at 1074–75 n.3. The *Shoafera* court granted Shoafera's petition over the dissent's argument that the IJ had made a partial adverse credibility determination regarding the ethnic motivation of Shoafera's attacker when it found that "the respondent's speculations,

however, and they are the Court believes speculations and conclusions, do not prove her claim." *Id*. at 1079 (Wallace, J, dissenting). The court reasoned that the IJ had not announced an adverse credibility determination, but instead had merely explained why, despite Shoafera's credible testimony, she had not established eligibility for asylum. *Id.* at 1074 n3. The *Shoafera* court also noted that "neither the IJ nor the INS elicited any testimony from Shoafera demonstrating that the nature or basis for her testimony was questionable." *Id.* at 1075.

This case presents an even more clear-cut record on the IJ's credibility determination than *Shoafera.* The record in this case does not include "speculations and conclusions" which raised the issue of an adverse credibility determination and split the panel in *Shoafera*. And here, as established by the removal hearing transcript quoted above, both Singh's counsel and counsel for the government specifically examined Singh on what he was claiming. His uncontroverted answers show that he was persecuted "only" because he had employed Khan and because the police wanted to find out information regarding Khan. For the majority in this case to reach a different conclusion would be to rely on the same sort of "speculations and conclusions" that the *Shoafera* court found out-of-place in considering a credibility determination.

Even if we deemed that the factual circumstances upon which the IJ relied for his imputed political opinion finding need not be taken as true, the BIA's decision still would be supported by substantial evidence. The majority emphasizes the "working against the government" accusation as evidence that the persecution in this case is based on imputed political opinion. However, in the cases cited by the majority, the

"against the government" accusations, and similar statements, have been evaluated in the context of the surrounding circumstances upon which the accusation is made, and not just because the phrases were spoken.

In *Zhiquang Hu v. Holder*, 652 F.3d 1011 (9th Cir. 2011), the Chinese police accused Hu of "gathering a crowd to cause trouble and disturb the order of society," along with acting against the government. *Id.* at 1017. In response to the police abuse, Hu told them that he was "merely in favor of 'the legal rights of those laid off workers,'" *id.*, a clearly political motivation. The cases cited by the *Zhiquang Hu* court also share a link between the "against the government" accusation and some identified act or conduct which constituted a protected ground. In *Yan Xia Zhu v. Mukasey*, 537 F.3d 1034, 1045 (9th Cir. 2008), the petitioner suffered harm on account of an imputed political opinion, where the Chinese police arrested petitioner and accused her of being "against the government" after she sent a letter to the local town condemning the appointment of her rapist to a position of local political power. And in *Baghdasaryan v. Holder*, 592 F.3d 1018, 1024–25 (9th Cir. 2010), political opinion was imputed to a petitioner where a "top law enforcement official indicated that [the petitioner] was detained and beaten because he was 'defaming' and 'raising his head'" against government corruption.

Unlike those cases, there is no reason here to believe that the basis for the accusations made against Singh went beyond what Singh testified to. The one underlying factual circumstance that gave the police their reason to arrest and interrogate Singh, as Singh himself acknowledges, was that he had employed a suspected terrorist. And based on that, the police accused Singh of helping the terrorists, harboring

information regarding activities of individuals planning against the government, being a traitor and working against the government. Police at no time accused Singh of being a terrorist himself; at no time during Singh's torture did they attempt to exact from him a confession to being a terrorist; and at no time did their actions deviate from what was, according to the evidence, an interrogation to gain information about Khan, not one where Singh's political opinion made him a terrorist suspect.

I do agree with the import of the majority's opinion, that the only way to find a nexus to imputed political opinion is to characterize Singh as a terrorist. "To establish an imputed political opinion, the applicant must show that his persecutors actually imputed a political opinion to him." *Sangha v. INS*, 103 F.3d at 1489 (quoting *Arreiaga-Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir. 1991)). Yet, that characterization of the police's motives for persecuting Singh is based on supposition. In this case, Singh insisted to police that Khan was not a terrorist at all, let alone that he knew that Khan was one. The single fact that Singh hired Khan does not reflect sufficient motive for the conclusion that the government thought that Singh was politically aligned with the terrorists. This is not a case, like *Singh v. Ilchert*, 63 F.3d 1501 (9th Cir. 1995), *superseded by statute on other grounds as stated by Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009), where the government concedes that police thought that the petitioner was a militant because he had been visited overnight and on six other occasions by a group of known and armed militants. *Singh v. Ilchert*, at 1503–04, 1509. It is a case of the police taking Singh's hiring of a suspected terrorist to its logical extension–that Singh would have useful information about that terrorist. That the police crossed all

boundaries in pursuing that lead does not change the factor motivating them.

The majority further reasons that the police's interest in Singh's relationship to Khan serves as indirect evidence of an imputed political opinion. According to the majority, because the police accused Singh of being a "traitor" based solely on his association with Khan, they imputed a political opinion to him. However, the police's use of the word "traitor," according to Singh, was connected to the accusation of working against the government. As with the "working against the government" charge, there is no reason to believe that the "traitor" label applied by police reached beyond the accusations that Singh helped the terrorists, had information regarding their activities, and knowingly employed one. Nor would the police's use of an epithet, such as calling Singh a "dog," reveal an imputed political opinion. *See Danilova v. Holder*, — Fed. Appx. —, 2014 WL 2211724, at *1 (9th Cir. May 29, 2014) ("Substantial evidence also supports the BIA's conclusion that ethnic slurs used by police while mistreating Danilova did not show that her interracial relationship, rather than investigation of crime, was the reason for the Moldovan authorities' interest in her") (citing *Parussimova v. Mukasey*, 555 F.3d at 741–42).

The majority cites *Silaya v. Mukasey*, 524 F.3d 1066 (9th Cir. 2008), for the conclusion that the police targeted Singh and imputed antigovernment views to him because of his relationship with Khan. In *Silaya*, the petitioner was kidnapped, tortured and raped by members of a violent antigovernment opposition group who knew who the petitioner was, knew that her father was a veteran who supported the government, and made comments indicating that the petitioner "was chosen as a victim because of her

father's ties to the government." *Id*. at 1072. In this case, no such link to the political views of a family member exists. In fact, even if there was evidence that the police were motivated to punish Singh simply because of his association with Khan, "'evidence pointing to another motive,' [makes] *Silaya* []not on point." *Sharma v. Holder*, 633 F.3d 865, 872 (9th Cir. 2011) (citing *Navas v. INS*, 217 F.3d 646, 659 n.18 (9th Cir. 2000)). In *Sharma*, the court found that "[w]here police beat and threaten the spouse of a known dissident, it is logical, *in the absence of evidence pointing to another motive,* to conclude that they did so because of the spouse's presumed guilt by association." *Sharma v. Holder*, at 871 (citing *Navas*, 217 F.3d at 659 n. 18) (emphasis added)). Here, there is no absence of evidence that the police arrested and interrogated Singh only in their pursuit of information about Khan. The majority's hunt for circumstantial evidence to demonstrate otherwise comes up empty-handed.

The majority also concludes that there is little evidence that the police in Singh's case were engaged in a legitimate investigation. In summing up why he was arrested, Singh testified that he "was only arrested because of Jabed Khan and they said he was a terrorist and police alleged that I was helping the terrorists." But, that falls short of "show[ing] that [Singh's] persecutors actually imputed a political opinion to him." *See Sangha v. INS*, 103 F.3d at 1489. Certainly, the police thought that Singh, whether knowingly or unknowingly, had helped a terrorist by employing Khan for two years. But the evidence is devoid of any interest by the police about Singh's own political opinions, and the police's brutality in interrogation does not fill the space in the analysis. The lack of interest by police in Singh's political opinion is only punctuated by the fact that the police released

Singh after each arrest and interrogation upon the payment of a bribe.

Finally, the majority claims that even if a legitimate investigatory reason existed for Singh's persecution, Singh has presented sufficient evidence to show that imputed political opinion was also a central reason for it. "The task of the alien is simply to demonstrate the reasonableness of a motivation which related to one of the enumerated grounds." *Singh v. Ilchert*, 63 F.3d at 1510 (citing *Matter of R-*, Int. Dec. 3195, 12–13 (BIA 1992) (Dunne, M.M. dissenting in part)); *see also Parussimova v. Mukasey*, 555 F.3d at 741 (petitioner must "produce evidence from which it is reasonable to believe that the harm was motivated, *at least in part*, by an actual or implied protected ground") (citing *Borga v. INS*, 175 F.3d 732 (9th Cir. 1999) (en banc) (first emphasis in original)).

I submit that it is not reasonable to conclude that a central reason for the Indian police's persecution of Singh was based on imputed political opinion. Singh confirmed in his testimony that the only reason for his arrests and interrogations was to gain information about Khan and what Singh had done to help terrorist groups. The police never accused Singh of being a terrorist, and never asked him to confess that he was. The police never accused Singh of being a terrorist to anyone else, including his wife, even though after Singh fled to the United States, the police went to Singh's house numerous times and arrested his wife to try to locate Singh. And, had the police believed Singh to be a terrorist or hold political opinions aligning himself with the terrorists, one would not expect the police to release him on two separate occasions after torture did not extract the information about Khan that they were seeking.

Whether or not we respect the IJ's credibility determination, the BIA had ample reason to believe that Singh did not meet his burden of proof. Certainly, it was not compelled to do so. I would, therefore, deny the petition for review and application for withholding of removal.

I concur with the opinion insofar as it remands for the granting of relief pursuant to the Convention Against Torture.