**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARMEN BAGHDASARYAN,

          *Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,

          *Respondent.*

No. 05-72416

Agency No.
A077-993-598

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 30, 2009—Pasadena, California

Filed January 13, 2010

Before: Harry Pregerson, Stephen Reinhardt and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Pregerson

935

## COUNSEL

Shawn Sedaghat, Law Offices of Shawn Sedaghat, Encino, California, for the petitioner.

Brigid Martin, United States Department of Justice, San Francisco, California; Michael L. Scott, for the respondent.

---

## OPINION

PREGERSON, Circuit Judge:

Armen Baghdasaryan ("Baghdasaryan") is a native and citizen of Armenia. Baghdasaryan petitions for review of the Board of Immigration Appeals's ("BIA") decision affirming the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] Baghdasaryan was threatened, harassed, fined, detained, and beaten because he opposed the systemic government corruption, including the extortion of bribes, perpetrated by General H. Hakopian, a powerful politician and government official. We have jurisdiction under 8 U.S.C. § 1252, and we grant the petition in part and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

### I. FACTUAL BACKGROUND

The BIA found Baghdasaryan to be credible. Accordingly, we must accept Baghdasaryan's testimony as true. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004) ("Testimony must be accepted as true in the absence of an explicit adverse credibility finding.").

---

[1]We do not reach the CAT claim, which the parties did not fully brief and the BIA summarily dismissed.

In Armenia, Baghdasaryan operated a small business making and distributing audio tapes from his home. In September 1995, Baghdasaryan moved his business to a store in a local market owned by General Hakopian, a well-known general at the Ministry of Defense, who later became a deputy of the National Assembly. The market was similar to a swap meet, with hundreds of vendors selling items in a large area. Baghdasaryan obtained the proper permit to sell his goods, paid tax on his sales, and remitted rent to General Hakopian for use of his space in the market. The record does not show whether General Hakopian was entitled to keep the entire amount of rent payments for himself.

One month later, Samvel Hakopian ("Samvel"), General Hakopian's nephew, and several other men came to Baghdasaryan's store and demanded $100 per month on behalf of the General, in addition to rent. Baghdasaryan refused to pay and filed a written complaint against General Hakopian with a local judge. When Baghdasaryan received a second visit from Samvel demanding money on General Hakopian's behalf, he followed up on his judicial complaint. Shortly thereafter, Baghdasaryan was arrested and fined $100 by the tax authority for working without a license that no other vendor was required to have. Baghdasaryan could only operate his business if he paid a monthly $100 "surcharge" to the tax authority. Baghdasaryan eventually received the license after paying a $500 bribe.

After he was arrested and fined, Baghdasaryan began organizing the other business owners in the market to fight against General Hakopian's corruption. In February 1996, Baghdasaryan and one hundred other business owners organized a rally to publicize the bribes exacted by General Hakopian, which they believed the government sanctioned. A few days later, four individuals representing themselves as criminal investigators entered Baghdasaryan's store and conducted a search without a warrant. Allegedly, the criminal investigators received a complaint that Baghdasaryan was selling illegal

items, but they failed to find any contraband in the store. Around the same time, Baghdasaryan began receiving phone calls threatening "dire consequences" if he did not withdraw his complaint against General Hakopian.

During this time, the business owners also went on strike for two days. After the strike, General Hakopian became very angry and told Baghdasaryan that he knew Baghdasaryan had organized the strike. General Hakopian demanded that Baghdasaryan either stop his organizing activities or face further problems. Fearing harm to his family and himself, Baghdasaryan started paying the monthly $100 bribe and did so for several years.

Baghdasaryan's wife, Hamsik Aznavuryan, and their two children were eligible under the Lautenberg Amendment to seek asylum in the United States.[2] Baghdasaryan sent his wife and children to safety in the United States in February 2001, and then resumed his organizing activities. Baghdasaryan scheduled another rally for February 13, 2001. Several days before this rally took place, militia men forcibly took Baghdasaryan from his home in the early hours of the morning without a warrant. The militia detained Baghdasaryan for twenty days without charge. During his detention, Baghdasaryan was beaten. During the beating, the Chief of the Criminal Section told him that he must behave "normally" and that he was "defaming" and "raising his head" against the deputy of the National Assembly, General Hakopian. The beating only stopped when Baghdasaryan agreed to stop opposing General Hakopian and exposing his corruption.

When Baghdasaryan returned home from jail, his mother informed him that she had received phone calls from people

---

[2]The Lautenberg Amendment permits Jewish and evangelical Christian refugees from the former Soviet Union and Indochina to seek asylum in the United States. Aznavuryan and the children have resided legally in the United States since 2001.

associated with General Hakopian. The callers knew the address of Baghdasaryan's family's in the United States and threatened to harm his family if Baghdasaryan did not "behave . . . calmly." Soon thereafter, Baghdasaryan had an emotional breakdown, which required him to stay in the hospital for two months.

In May 2001, Baghdasaryan left Armenia and attempted to join his family in the United States by traveling through South America. This attempt failed, and he returned to Armenia three months later, in August 2001. When Baghdasaryan returned, two individuals from the Armenian National Security Service met him and told him that "it would be much better if [you] went back from where [you] just came from . . . ."

## II.   PROCEDURAL HISTORY

Baghdasaryan entered the United States using a fraudulent visa on October 22, 2001. On October 30, 2001, the Immigration and Naturalization Service ("INS")[3] served Baghdasaryan with a Notice to Appear. On January 21, 2002, Baghdasaryan appeared before the IJ and did not concede removability. Baghdasaryan submitted an application for asylum and withholding of removal based on political opinion. He also requested relief under CAT. After the merits hearing, the IJ issued an oral decision finding Baghdasaryan not credible and alternatively held that he had not established a nexus to a protected ground. The IJ denied all forms of relief.

Baghdasaryan appealed to the BIA. The BIA reversed the IJ's adverse credibility determination, but nevertheless dismissed the appeal for failure to establish a nexus to a protected ground. The BIA found "very little indication" that the

---

[3]On March 1, 2003, the INS was abolished and its functions were transferred to the newly created Department of Homeland Security ("DHS"). *See* Homeland Security Act of 2002 § 471, 6 U.S.C. § 291. We refer simply to the immigration agency simply as the "Government" in this opinion.

Armenian government was imputing any political opinion to Baghdasaryan and that Baghdasaryan was merely the "victim [of] criminal misconduct." The BIA also affirmed the IJ's denial of relief under CAT. Baghdasaryan timely appealed.

## STANDARD OF REVIEW

Because the BIA conducted a de novo review of the IJ's decision, our review is "limited to the BIA's decision except to the extent that the IJ's opinion is expressly adopted [by the BIA]." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006). We typically review the BIA's asylum and withholding of removal determinations under the substantial evidence standard.[4] *See Sinha v. Holder*, 564 F.3d 1015, 1020 (9th Cir. 2009). Under the substantial evidence standard, the BIA's determinations will be upheld "if the decision is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Zhao v. Mukasey*, 540 F.3d 1027, 1029 (9th Cir. 2008) (quoting *Abebe v. Gonzales*, 432 F.3d 1037, 1039-40 (9th Cir. 2005) (en banc)). Reversal, however, is appropriate when "the evidence in the record compels a reasonable factfinder to conclude that the [BIA's] decision is incorrect." *Id.*

---

[4]Baghdasaryan argues that the BIA's asylum and withholding of removal determinations are reviewed de novo. Although we typically review the BIA's asylum and withholding of removal determinations for substantial evidence, there is support for Baghadasaryan's position that de novo review applies here. When an applicant is deemed credible, we have considered nexus issues to be questions of law entitled to de novo review. *See Singh v. Ilchert*, 63 F.3d 1501, 1506 (9th Cir. 1995) (reviewing de novo the BIA's decision that the applicant was not persecuted on account of imputed political opinion when the IJ made a favorable credibility finding) *superseded by statute on other grounds as stated by Parussimova v. Mukasey*, 555 F.3d 734, 739-40 (9th Cir. 2009). Because Baghadasaryan is eligible for relief under either standard, it is unnecessary to reach this issue.

## DISCUSSION

### I. THE BIA'S CONCLUSION THAT BAGHDASARYAN WAS INELIGIBLE FOR ASYLUM IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

**[1]** To be statutorily eligible for asylum, Baghdasaryan must show that he is a refugee. 8 U.S.C. § 1158(b)(1). A refugee is one who is "unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Either past persecution or a well-founded fear of future persecution provides eligibility for a discretionary grant of asylum." *Ratnam v. INS,* 154 F.3d 990, 994 (9th Cir. 1998).

**[2]** An applicant alleging past persecution has the burden of establishing that (1) his treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control. *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir. 2000).

The BIA concluded that Baghdasaryan was not eligible for asylum because he failed to establish a nexus between his mistreatment and a protected ground. *See* 8 U.S.C. § 1101(a)(42)(A). This conclusion is contrary to the record and our case law, which establishes that opposition to government corruption is an expression of political opinion. *See Fedunyak v. Gonzales*, 477 F.3d 1126, 1129 (9th Cir. 2007). We hold that Baghdasaryan was harmed on account of political opinion and, accordingly, we remand his petition to the BIA to determine whether the harm that Baghdasaryan experienced rose to the level of persecution.

A.   *Nexus to a Protected Ground*

**[3]** A nexus is established when the past persecution is "on account of" one or more of the grounds enumerated in 8 U.S.C. § 1101(a)(42)(A), which include race, religion, nationality, membership in a particular social group, or political opinion.[5] *See Silaya v. Mukasey*, 524 F.3d 1066, 1070 (9th Cir. 2008). To demonstrate a nexus between the harm Baghdasaryan suffered and his political opinion, Baghdasaryan must show (1) that he held, or his persecutors believed that he held, a political opinion; and (2) that he was harmed because of that political opinion. *Navas v. INS*, 217 F.3d 646, 656 (9th Cir. 2000). Although "[p]urely personal retribution is . . . not persecution on account of political opinion," *Grava v. INS*, 205 F.3d 1177, 1181 n.3 (9th Cir. 2000), it is well established that mixed motives do not negate a legitimate nexus to political opinion, *see*, *e.g.*, *Fedunyak*, 477 F.3d at 1130 (nexus established where persecution is motivated by both personal greed and applicant's complaints about government extortion); *Zhu v. Mukasey*, 537 F.3d 1034, 1045 (9th Cir. 2008) (nexus established where Chinese woman harmed because of a personal dispute with a government official and the political act of whistleblowing).

The BIA concluded that Baghdasaryan was not eligible for asylum because Baghdasaryan failed to demonstrate that his mistreatment was motivated by an imputed political opinion[6] and that "there is no evidence of any basis for his mistreat-

---

[5]Baghdasaryan filed his application for relief prior to May 11, 2005, the effective date of the REAL ID Act. Accordingly, nexus is evaluated according to the "on account of" standard, rather than the "central reason" standard codified in 8 U.S.C. § 1158(b)(1)(B)(i). *See Sinha*, 564 F.3d at 1021 n.3 (applying pre-REAL ID Act standards because petitioner's asylum application was filed before May 11, 2005).

[6]An imputed political opinion arises when "[a] persecutor falsely attributes an opinion to the victim, and then persecutes the victim because of that mistaken belief about the victim's views." *Canas-Segovia v. INS*, 970 F.2d 599, 602 (9th Cir. 1992).

ment other than his failure to pay the money requested." The BIA also noted that "it does not appear . . . that [Baghdasaryan] was a victim of anything other than criminal misconduct." Substantial evidence does not support the BIA's conclusion that General Hakopian mistreated Baghdasaryan merely because of a personal dispute. To the contrary, the evidence in the record would compel a reasonable factfinder to conclude that Baghdasaryan was mistreated because of his political opinion.

### 1. Political Opinion

**[4]** Whistle-blowing against government corruption is an expression of political opinion. *See*, *e.g.*, *Zhu*, 537 F.3d at 1044-45 (finding political opinion where a Chinese factory worker wrote a letter of complaint to the town government after her supervisor, who was also a government official, raped her); *Fedunyak*, 477 F.3d at 1129 (finding political opinion where Ukrainian business owner filed complaints opposing government extortion scheme); *Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir. 2004) (finding political opinion where a journalist wrote a newspaper article criticizing a corrupt government official); *Desir v. Ilchert*, 840 F.2d 723, 724, 728-29 (9th Cir. 1988) (finding political opinion where a Haitian fisherman refused to accede to extortion by government security forces).

**[5]** Here, Baghdasaryan opposed and publicly criticized General Hakopian's extortion scheme. He filed a complaint with a judge, organized his fellow business owners at the market into an informal union to fight the extortion, and held several successful rallies and strikes to publicize the corruption. Accordingly, Baghdasaryan is a whistle-blower whose opposition to General Hakopian's corruption qualifies as a political opinion.

**[6]** The Government attempts to distinguish our whistle-blower line of cases on the ground that this case does not

involve systemic government corruption. We disagree. Where, as here, a government official uses the resources of his office to extort bribes from many people, he is engaged in more than aberrational conduct. *See*, *e.g.*, *Hasan*, 380 F.3d at 1117, 1120 (holding that a journalist exposed systemic government corruption by writing an article about a corrupt government official who acted like a "godfather" with the implicit permission of law enforcement and other government officials); *Zhu v. Mukasey*, 537 F.3d 1034, 1044 (9th Cir. 2008) (holding that filing a complaint against a factory manager, who was also a government official, for raping an employee is a political act when interpreted as an act of opposition to the government).

**[7]** Here, General Hakopian, like the corrupt government official in *Hasan*, is a powerful figure who extorted bribes from Baghdasaryan and hundreds of other business owners at the market with the permission, and sometimes the assistance, of law enforcement and other government officials. A review of the evidence demonstrates that General Hakopian was engaged in systemic government corruption. When Baghdasaryan refused to pay the bribe and filed a complaint, the tax authority arrested and fined him for working without a license that no other market vendor needed. The "fine" was the same amount as the bribe and Baghdasaryan could not obtain the license until he paid the "fine" for several months. When Baghdasaryan publicized General Hakopian's extortion scheme, the militia arrested him, detained him without a warrant for twenty days, and beat him while a top law enforcement officer told him that he was "defaming" and "raising his head" against General Hakopian. The National Security Service also threatened Baghdasaryan. The participation of these various government actors demonstrates that General Hakopian's corruption was systemic. Accordingly, a reasonable factfinder would be compelled to conclude that Baghdasaryan's whistleblowing activity against extortion and corruption was an expression of his political opinion.

2. Nexus

**[8]** Moreover, a reasonable factfinder would be compelled to conclude that Baghdasaryan was mistreated, at least in part, *because of* his whistleblowing activity. Baghdasaryan was threatened, harassed, arrested, and beaten after filing a complaint and publicly protesting the government sanctioned extortion practiced by General Hakopian. While Baghdasaryan was beaten in detention, a top law enforcement official told him that he was "defaming" and "raising his head" against General Hakopian. This is direct and concrete evidence that Baghdasaryan was beaten *because of* his opposition to the government corruption perpetrated by General Hakopian. Because the BIA ignored this compelling evidence of nexus, its conclusion that Baghdasaryan failed to establish nexus is not supported by substantial evidence.

Despite the compelling evidence of nexus in the record, the Government urges us to find that Baghdasaryan was merely "on the wrong side of a personal dispute with the powerful owner of the market who was also a government official." To support its position, the government cites two cases, *Molina-Morales v. INS*, 237 F.3d 1048 (9th Cir. 2001) and *Zayas-Marini v. INS*, 785 F.2d 801 (9th Cir. 1986). Neither of these cases are controlling.

In *Molina-Morales*, the petitioner was persecuted after filing a rape complaint against the leader of a political party, but we declined to find a nexus based on political opinion because the petitioner did not have a political opinion and no evidence suggested that any political opinion was imputed to him. 237 F.3d at 1051. Here, unlike in *Molina-Morales*, Baghdasaryan demonstrated that he held a political opinion—opposition to the systemic government corruption perpetrated by General Hakopian. Moreover, unlike in *Molina*, the record suggests that a political opinion was imputed to Baghdasaryan. A top law enforcement official indicated that Baghdasaryan was detained and beaten because he was "defaming" and "raising

his head" against General Hakopian. This comment indicates that the Armenian government viewed Baghdasaryan as a protestor and punished him for his resistance to government corruption. Thus, *Molina-Morales* does not govern this case.

*Zayas-Marini* is also inapposite. In that case, we declined to find persecution on account of political opinion where the petitioner was a member of the Paraguayan elite who had personal disputes with several individuals in the ruling political party. 785 F.2d at 806. Subsequent cases have limited *Zayas-Marini* to situations in which the persecuted and persecutor are social and political equals, and where the persecutors act solely out of their individual capacities.[7] Here, there is a substantial disparity between the social and political power of General Hakopian, a powerful regional official, and Baghdasaryan, a struggling small business owner. Moreover, Baghdasaryan experienced mistreatment by officials acting under color of law, including the milita, National Security forces, and the tax authority, rather than private individuals acting in their individual capacities. Accordingly, *Zayas-Marini* is not controlling.

While some of the harm that Baghdasaryan experienced may have been motivated by the personal greed of General Hakopian, substantial evidence does not support the BIA's determination that Baghdasaryan was harmed for personal reasons alone. Baghdasaryan's testimony that he was harassed, threatened, arrested, and beaten by the government compels the conclusion that he was harmed, at least in part,

---

[7]*See Zhu*, 537 F.3d at 1044 (distinguishing *Zayas-Marini* because police acting under the color of law threatened the petitioner, rather than private individuals acting in their individual capacities); *Desir v. Ilchert*, 840 F.2d 723, 728 (9th Cir. 1988) (distinguishing *Zayas-Marini* because the petitioner was not the social and political equal of his persecutor); *Lazo-Majano v. INS*, 813 F.2d 1432, 1436 (9th Cir. 1986) (same), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996) (en banc).

due to his political opinion expressed through his opposition to government corruption.

B.   *Committed by the Government*

The BIA concluded that Baghdasaryan was only a "victim . . . of criminal misconduct." Therefore, the BIA did not view the Armenian government to be the source of Baghdasaryan's persecution. This conclusion is not supported by substantial evidence.

**[9]** "[W]hen the government is responsible for the persecution, the third prong of our asylum inquiry is satisfied without further analysis." *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 (9th Cir. 2004). Here, the evidence shows that Baghdasaryan was mistreated by the militia, National Security Service, the tax authority, and criminal investigators. Accordingly, any reasonable factfinder would be compelled to find that the Armenian *government* mistreated Baghdasaryan on account of his political opinion, as expressed through his opposition to government corruption. We therefore remand to the BIA to consider whether the threats, harassment, fines, detention, and beating that Baghdasaryan experienced rose to the level of persecution.[8]

---

[8]Neither the IJ nor the BIA explicitly considered whether the mistreatment that Baghdasaryan experienced rose to the level of persecution. Accordingly, we are compelled to remand this question to the BIA. *See*, *e.g.*, *Deloso v. Ashcroft*, 393 F.3d 858, 865 n.5 (9th Cir. 2005). In doing so, however, we note the credible evidence that Baghdasaryan was detained, beaten, and threatened on numerous occasions. *See*, *e.g.*, *Ahmed v. Keisler*, 504 F.3d 1183, 1194 (9th Cir. 2007) (finding that detentions, beatings, and threats rose to the level of persecution where they were disproportionate to applicant's civil disobedience); *Ndom v. Ashcroft*, 384 F.3d 743, 756 (9th Cir. 2004) (finding that threats and detentions for a total of twenty-five days constitutes persecution), *superseded by statute on other grounds as stated by Parussimova v. Mukasey*, 555 F.3d 734, 739-40 (9th Cir. 2009).

## II. BAGHDASARYAN'S APPLICATION FOR WITHHOLDING OF REMOVAL SHOULD BE RECONSIDERED

**[10]** The BIA dismissed Baghdasaryan's appeal from the IJ's denial of his application for withholding of removal without any explanation. This lack of explanation is understandable because the BIA concluded that Baghdasaryan failed to establish nexus, which is required to establish eligibility for withholding of removal. *See* 8 C.F.R. § 1208.16(b). Because we conclude that Baghdasaryan has established nexus, we remand for a determination of whether he is eligible for withholding of removal, in addition to asylum.

## CONCLUSION

For these reasons, we conclude that the BIA's denial of asylum is not supported by substantial evidence. We remand with instructions for the BIA to determine whether the mistreatment that Baghdasaryan experienced on account of his political opinion rose to the level of persecution. We also remand for the BIA to consider whether Baghdasaryan is eligible for withholding of removal.

**GRANTED AND REMANDED.**