Opinion by Judge GRABER; Concurrence by Judge OWENS; Dissent by Judge KLEINFELD.
OPINION
GRABER, Circuit Judge:
Petitioners Hayk and Nadezhda Khu-daverdyan seek asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (“CAT”), Dec. 10, 1984, 1465 U.N.T.S. 85. The Armenian military police detained, beat, and threatened Petitioner[1] after he was seen talking to a reporter following a personal confrontation with the city’s military police chief. The Board of Immigration Appeals (“BIA”) held that, because Petitioner failed to prove that he intended to expose corruption when he talked to the reporter, he did not demonstrate that he was persecuted because of his actual political opinion. The BIA further held that Petitioner failed *1104 to show that his mistreatment at the hands of the military police rose to the level of torture within the meaning of the CAT. Although we find no error in those rulings, the BIA failed to address evidence in the record that Petitioner was persecuted on account of an imputed, political opinion, that is, because military police officials thought that he was talking to the reporter in an attempt to expose government corruption. That failure is an error of law. Accordingly, we grant the petition for review in part, as to the asylum and withholding claims, and remand to the BIA for further proceedings consistent with this opinion.[2]
FACTUAL AND PROCEDURAL HISTORY
Petitioners are citizens of Armenia who seek asylum, withholding of removal, and protection under the CAT. The immigration judge (“IJ”) expressly found Petitioner credible, and the BIA did not disagree, so we accept his testimony as true. Cole v. Holder, 659 F.3d 762, 770 (9th Cir.2011).
Petitioner’s problems began with a confrontation with the Armenian military police chief in Petitioner’s home city. While dining with friends at the hotel where Petitioner worked as a manager, the police chief complained about the food and the service. When Petitioner defended himself and his staff, the police chiefs bodyguards took Petitioner outside and beat him.
About a week later, a reporter approached Petitioner and asked about the incident involving the police chief. Petitioner testified that the reporter worked for a print publication called “A Plus One.” A United States Department of State Country Conditions report, included in the record, identified “Al Plus” as an “opposition” news outlet in Armenia. The IJ found that, although it was not certain that the two were the same news agency, it is “unlikely” that there would be two Armenian opposition news agencies with such similar names.
Petitioner told the reporter that he could not talk about the incident at that time and arranged to meet her the next day. At that second meeting, the reporter told Petitioner that she was preparing an article about the leading officials in the Armenian government — an important topic, she said, because of upcoming elections. She tried to convince Petitioner to give her information about his altercation with the police chief. She argued that, if stories like his did not come to light, the country would remain in a “bad situation with its people.” Petitioner told the reporter that he was too frightened to help her, and he left the meeting.
Immediately after the second meeting with the reporter, two men forced Petitioner into a black car. Petitioner was detained overnight in a dark room at the military police station. The next morning he was interrogated, beaten, and accused of espionage. He was then taken to meet with the chief of the military police’s investigative department. The investigative chief told Petitioner that he could expect “life imprisonment” for spying. He also threatened Petitioner by noting that Petitioner’s son was approaching military age and could be drafted and deployed to a dangerous conflict zone. The investigative chief told Petitioner that he was in trouble *1105 because he was “trying to dishonor the military police, and things like [that] cannot be allowed”; the police would “deal with the reporter separately.” Petitioner was released the next day, after his wife and cousin paid a $3,000 bribe and promised that Petitioner would leave Armenia.
The IJ held that Petitioner was ineligible for asylum and withholding of removal because he had failed to establish that he was persecuted on account of political opinion. The IJ concluded that Petitioner’s conversation with the reporter did not amount to whistleblowing because Petitioner
was telling about one incident with one police chief, not about the whole police force. It was not an act of corruption within the police department....
... [Petitioner] was not complaining about any bribes, he was not complaining about any money that the police chief took, he was not complaining that the police chief tried to not pay for his service, he was simply stating to the reporter that the police chief had him beaten up because he did not like what appeared to be an insult to him.
... I do not find that what [Petitioner] was stating would show corruption. And in order to be whistle blowing you have to show corruption.
The IJ also concluded that the harm that Petitioner suffered did not rise to the level of torture.
On appeal, the BIA held that Petitioner was ineligible for asylum or withholding of removal because he had not demonstrated a nexus between his actual political opinion and the harm that he experienced. In so holding, the BIA wrote that, “[t]o the extent that [Petitioner] sought to publicize his mistreatment, he has not demonstrated that his actions were meant to expose corruption in a governing institution, in this case the military police.” The BIA contrasted the facts in Petitioner’s case to the facts in Baghdasaryan v. Holder, 592 F.3d 1018 (9th Cir.2010):
Unlike the [petitioner] in Baghdasar-yan, [id] at 1024, who engaged in a persistent and very public campaign against a widespread protection racket, the actions of [Petitioner] in this case were limited to answering a reporter’s questions about an aberrational abuse of power committed by a single law enforcement official.
The BIA adopted the portion of the IJ’s opinion finding that the initial altercation and subsequent retaliation were “purely personal” and not examples of corruption. Because it found that Petitioner had failed to establish a nexus between persecution and “his imputed political opinion,” the BIA held that Petitioner was ineligible for asylum or withholding of removal without reaching the question whether the harm that Petitioner suffered constituted persecution. Finally, the BIA held that Petitioner was ineligible for CAT relief because he had not been tortured.
Petitioners timely petition for review.
STANDARD OF REVIEW
Our review is “limited to the BIA’s decision, except to the extent that the IJ’s opinion is expressly adopted.” Popova v. INS, 273 F.3d 1251, 1257 (9th Cir.2001) (internal quotation marks omitted). We review de novo the BIA’s legal determinations and for substantial evidence the BIA’s factual determinations. Id. We will remand if the BIA rested its conclusion on “erroneous legal premises.” Grava v. INS, 205 F.3d 1177, 1182 (9th Cir.2000). We also will remand if the BIA did not reach an essential issue. Orlando Ventura, 537 U.S. at 17-18, 123 S.Ct. 353.
*1106 DISCUSSION
To establish eligibility for asylum, a petitioner must prove that he or she is “unable or unwilling” to return to his or her country of origin because of “persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a political social group, or political opinion.” . 8 U.S.C. §§ 1158(b)(1)(B)(i), 1101(a)(42)(A). A petitioner must show that there is a “nexus between [the] mistreatment and a protected ground.” Baghdasaryan, 592 F.3d at 1023. If the protected ground is political opinion, the petitioner must demonstrate that he or she (1) “had either an affirmative or imputed political opinion,” and (2) was “targeted on account of that opinion.” Sagaydak v. Gonzales, 405 F.3d 1035, 1042 (9th Cir.2005). Under the provisions of the REAL ID Act, which apply here, the protected characteristic must be “at least one central reason” for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i).
The facts in this case require us to connect two long-established lines of precedent concerning political opinion as a protected ground. In the first line of cases, we have repeatedly recognized that official retaliation against a whistleblower may amount to persecution on account of political opinion. See Baghdasaryan, 592 F.3d at 1024 (listing whistleblowing cases). In determining whether the whistleblowing constitutes protected political opinion, the “salient question” is whether the individual’s actions are “directed toward a governing institution, or only against individuals whose corruption was aberrational.” Grava, 205 F.3d at 1181.
In the second line of cases, we have made clear that “an applicant may establish a political opinion for purposes of asylum relief by showing an imputed political opinion.” Kumar v. Gonzales, 444 F.3d 1043, 1053-54 (9th Cir.2006) (internal quotation marks omitted) (listing imputed political opinion cases). To demonstrate that persecution is on account of an imputed political opinion, a petitioner need not prove that he or she actually held a political opinion or acted in furtherance of it, but must provide “some evidence,” “direct or circumstantial,” that the persecutor was motivated by a belief that the petitioner held the political opinion. INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (emphasis omitted).
We now apply those two lines of cases to hold that one form of imputed political opinion is perceived whistleblowing. That is, an applicant for asylum or withholding of removal may demonstrate persecution on account of a protected ground if he or she shows that the persecutor thought that the applicant was attempting to expose corruption in a governing institution and mistreated the applicant as a result, even if the applicant in fact had no such intention.
Substantial evidence supports the BIA’s conclusion that Petitioner was not an actual whistleblower. But the' BIA’s analysis was incomplete, because it failed to address whether Petitioner was harmed on account of an imputed political opinion. The BIA should have considered whether Petitioner had shown that the military police believed that he was a whistleblower and mistreated him as a result of that belief. More specifically, the question is whether the military police believed that Petitioner’s conversation with the reporter was “directed toward a governing institution,” as distinct from being directed only toward the police chiefs “aberrational” conduct. Grava, 205 F.3d at 1181.
In Singh v. Holder, 764 F.3d 1153 (9th Cir.2014), we addressed what type of evidence can demonstrate that a persecutor imputed a political opinion to an applicant. Testimony regarding a per *1107 secutor’s statements about motive is direct evidence that the applicant’s political opinion motivated the persecution. Id. at 1159. In Singh, the “direct evidence” consisted of the petitioner’s credible testimony that the police called him a “ ‘traitor’ ” and accused him of “ ‘working against the government.’ ” Id. A petitioner’s “association with, or relationship to, people who are known to hold a particular political opinion” may serve as indirect evidence of imputed political opinion. Id. (internal quotation marks omitted). In Singh, the “indirect evidence” was that the police had interrogated the petitioner about his domestic servant, a man whom the police characterized as a “terrorist.” Id. at 1157, 1159. We held that the direct and indirect evidence, taken together, “compelled] the conclusion” that the petitioner was subjected to abuse because of “imputed political opinion.” Id. at 1162.
Here, Petitioner provided direct evidence of a nexus to imputed political opinion when he testified credibly that the chief of the investigative department accused him of trying to “dishonor the military police” and accused him of espionage. Petitioner provided indirect evidence of a nexus when he introduced evidence that (1) he was picked up immediately after his meeting with the reporter; (2) the reporter was seeking to publish a pre-election’ article about corruption of leading governmental officials and encouraged him to talk to her because, if stories like his did not come to light, the country would “stay in a ... bad situation with its people”; (3) the chief of the investigative department told him that they would “deal with the reporter separately”; and (4) the reporter worked for an “opposition” newspaper.[3]
The question thus presented is whether that direct and indirect evidence is sufficient proof that (1) the military police believed Petitioner to be a whistleblower who was attempting to expose corruption and, if so, (2) their belief motivated them to detain, beat, and threaten Petitioner. Even though the BIA couched a portion of its holding in terms of imputed political opinion, a close look at the BIA’s decision reveals that it did not address that key question at all.
First, the BIA’s word choice shows that the BIA focused • on Petitioner’s intent rather than on the police officers’ perceptions: “To the extent that [Petitioner] sought to publicize his mistreatment, he has not demonstrated that his actions were meant to expose corruption in a governing institution, in this case the military police.” (emphases added). The BIA then cited Baghdasaryan to contrast the campaign to fight government extortion in that case with Petitioner’s single substantive conversation with a reporter. Again, the BIA focused on Petitioner’s intent, noting that the campaign in Baghdasaryan was “persistent and very public.” That reasoning and that citation provide ample support for the BIA’s determination that Petitioner was not an actual whistleblower, but they tell us nothing about whether the military police thought that Petitioner was a whis-tleblower.
Second, the BIA adopted the IJ’s finding that the retaliation against Petitioner was “purely personal, as it was motivated by the official’s desire to avoid the consequences of his violent reaction to [Petitioner’s] perceived insult.” But in reaching that conclusion, neither the BIA nor the *1108 IJ, in the parts of the opinion adopted by the BIA, addressed any of the direct or circumstantial evidence that the military police were attempting to silence Petitioner because they thought that he intended to expose government corruption.[4]
Moreover, the reasons that the IJ provided to support the conclusion that the retaliation was “purely personal” contravene our precedents. First, the IJ concluded that there was no corruption to expose because the initial confrontation at the hotel did not involve bribery or extortion. But the concept of government corruption is broader than that, and efforts to expose something that begins as a personal dispute can be interpreted as political dissent. See Yan Xia Zhu v. Mukasey, 537 F.3d 1034, 1043-45 (9th Cir.2008).[5] The IJ next concluded that a news story about Petitioner’s confrontation with the police chief would put only the police chief, rather than the entire military police system, in a bad light. But the fact that the information that Petitioner could have given to the reporter concerned conduct of a single individual does not necessarily mean that it would not serve to expose more general corruption. See Hasan v. Ashcroft, 380 F.3d 1114, 1120 (9th Cir.2004) (holding that the petitioner’s article criticizing a single governmental official was “directed toward a governing institution” because of its references to the “systemic nature” of that official’s corruption).
It is not entirely clear whether the BIA incorrectly applied the test for imputed political opinion or simply neglected to consider the question of imputed opinion at all. Either way, the BIA committed legal error. Accordingly, we grant in part the petition for review and remand to the BIA for further consideration of Petitioners’ asylum and withholding of removal claims. We express no view on (a) whether one central reason for the harm *1109 that Petitioner suffered was that the military police thought that he was engaged in whistleblowing intended to expose government corruption or (b) whether Petitioner has demonstrated harm rising to the level of past persecution or has shown a well-founded fear of future persecution.[6]
Petition DENIED in part,[7] GRANTED in part, and REMANDED. Costs on appeal awarded to Petitioners.

. Because Petitioners’ claims rest wholly on Hayk Khudaverdyan’s treatment at the hands of Armenian governmental officials, the singular "Petitioner” refers to him.

. We express no view on the merits of Petitioners' claims, which the BIA must address in the first instance. See INS v. Orlando Ventura, 537 U.S. 12, 16-18, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam) (holding that a court of appeals should remand, rather than review the record and decide an issue on the merits, when the BIA has not yet considered that issue).

. Even though we express no view on the ultimate merits of the imputed political opinion issue, we summarize the evidence of a nexus between the harm suffered and an imputed political opinion because the BIA's error would be harmless if nothing in the record could support a finding of a nexus. See Li Hua Yuan v. Att’y Gen. of U.S., 642 F.3d 420, 427 (3d Cir.2011) (surveying federal appellate decisions that applied the harmless-error standard in reviewing BIA decisions).

. According to the dissent, in remanding for the BIA to consider the police chiefs perception of Petitioner’s conversations with the reporter, we reject Petitioner's own testimony that the conflict was purely personal. Dissent at 19. But the dissent takes Petitioner's testimony that his abduction was caused by his disrespectful response to the police chief, and "[n]othing else,” out of context. There is no dispute that Petitioner's problems began with his response to the police chief's demands at the restaurant, so in that sense "nothing else” caused him to be beaten, jailed, and threatened. But Petitioner explained that the initial incident led to his conversations with the reporter, which in turn led the military police to detain, beat, and threaten him; according to Petitioner, much more was at play than simply the initial altercation.

. The dissenting opinion's crabbed view of what constitutes "corruption,” dissent at 22, is inconsistent with Yan Xia Zhu, in which the petitioner wrote a letter to government officials asking that they investigate her allegation that she had been raped by her factory manager. In the letter, the petitioner "also complained that ‘the government officers even let this kind of a person to be an officer’ ” and alleged that the official was able to obtain and keep his position of authority because of family connections. Yan Xia Zhu, 537 F.3d at 1037. We held that the petitioner's "condemn[ation of] the appointment and protection — on the basis of family political connections- — of people like the manager who raped her” constituted a revelation of corruption. Id. at 1044.
"Corruption” broadly refers to an abuse of public trust. Regalado-Escobar v. Holder, 717 F.3d 724, 729-30 (9th Cir.2013). In common parlance, as well as in precedent, "corruption” means a lack of integrity and a use of a position of trust for dishonest gain, which need not be financial. One form of "gain” is the maintenance of a position of authority. Yan Xia Zhu, 537 F.3d at 1037. We remand for the BIA to consider whether the evidence shows that the police chief, in an effort to keep his government job, used his position of power to silence a possible report about his abuse of that power. We do not, as ‘ the dissent claims, seek to extend asylum protections to "anyone anywhere who suffers abuse by an arrogant bully with a government job.” Dissent at 22.

. The dissenting opinion faults us for remanding to the BIA to consider an additional valid theory as to which the evidence could support relief. Dissent at 21. But as we have explained, the BIA either misunderstood or did not consider the imputed whistleblower theory. When the BIA fails to " 'state with sufficient particularity and clarity the reasons for’ ” its decision, it does not " 'provide an adequate basis for this court to conduct its review.'” Madrigal v. Holder, 716 F.3d 499, 509 (9th Cir.2013) (quoting Castillo v. INS, 951 F.2d 1117, 1121 (9th Cir.1991)). Moreover, the BIA’s use of the phrase "imputed political opinion” does not change our analysis, because “[b]oilerplate opinions” that "are devoid of statements that evidence an individualized review” of the issue "must be remanded to the Board for clarification of the bases for its opinion.” Castillo, 951 F.2d at 1121. We are not free to guess at what the BIA would have said about imputed whistle-blowing. By clarifying the applicable legal standard for imputed whistleblowing and remanding that issue to the BIA, we do not find fault with any of the BIA's factual findings and do not express a view on the ultimate outcome of the remanded claim.

. Substantial evidence supports the BIA's conclusion that Petitioner did not show that it is more likely than not that he will be tortured if he is removed to Armenia. The BIA permissibly ruled that the harm that Petitioner suffered does not rise to the level of treatment that we have previously recognized as torture. See Ahmed v. Keisler, 504 F.3d 1183, 1201 (9th Cir.2007).