**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAYA SINGH,

*Petitioner*,

v.

WILLIAM P. BARR, Attorney General,
*Respondent.*

No. 15-73940

Agency No.
A088-469-800

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted August 6, 2019[*]
San Francisco, California

Filed August 27, 2019

Before: Diarmuid F. O'Scannlain, Eugene E. Siler,[**]
and Jacqueline H. Nguyen, Circuit Judges.

Per Curiam Opinion

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY***

## Immigration

The panel denied a petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and Convention Against Torture protection to Daya Singh, a citizen of India who asserted claims for relief based on his imputed political opinion and whistleblowing activities exposing police corruption.

Singh challenged the Board's precedential opinion in *Matter of N–M–*, 25 I. & N. Dec. 526 (BIA 2011), setting forth a three-factor standard for determining whether retaliation for opposition to official corruption or whistleblowing constitutes persecution on account of a political opinion. Under that test, the immigration judge considers: (1) "whether and to what extent the alien engaged in activities that could be perceived as expressions of anticorruption beliefs," (2) "any direct or circumstantial evidence that the alleged persecutor was motivated by the alien's perceived or actual anticorruption beliefs," and (3) "evidence regarding the pervasiveness of government corruption, as well as whether there are direct ties between the corrupt elements and higher level officials." The panel explained that because *Matter of N—M*'s three factors correspond to this circuit's whistleblowing cases, it could not say that the Board's interpretation was unreasonable.

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the record did not compel the conclusion that police officers persecuted Singh on account of his imputed political opinion. The panel concluded that Singh's asylum claim therefore fails. The panel agreed with Singh that contrary to *Barajas-Romero v. Lynch*, 846 F.3d 351 (9th Cir. 2017), the Board erroneously applied the "one central reason" nexus standard, rather than the "a reason" standard, to Singh's withholding of removal claim. However, the panel concluded that it need not remand the case, because the Board adopted the immigration judge's finding of no nexus between the harm to Singh and the alleged protected ground, and thus neither the result nor the Board's basic reasoning would change. The panel also held that substantial evidence supported the Board's determination that Singh failed to establish that it was more likely than not that he would be tortured if he returned to India.

## COUNSEL

Robert B. Jobe and Morgan Russell, Law Office of Robert B. Jobe, San Francisco, California, for Petitioner.

Mary Jane Candaux, Assistant Director; Kurt B. Larson, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

PER CURIAM:

In this asylum case, we must decide whether an alien has established that he was persecuted because of his political opinion during confrontations with police in Punjab, India.

I

A

In September 2007, in Punjab, India, two militant Sikhs on a motorcycle shot at police officers and fled the scene. Police arrested and questioned Daya Singh ("Singh") and Tasvir Singh ("Tasvir"), but both men denied any knowledge of the shooting. During this interrogation, Tasvir began to argue with the officers, threatening to "file a case" against them to "see that [their] uniforms [were] removed." The officers retaliated: they beat Tasvir and, eventually, removed him from the police station. Singh never saw him again.

After five days of detention, Singh's father bribed the officers and secured his son's release. Meanwhile, Tasvir's father hired two lawyers to find his own son. Singh told the lawyers that he saw Tasvir argue with the officers before they took him away from the station. They recorded Singh's statement and sent it to "higher officials" in the Indian government.

Singh soon faced reprisals: Punjabi officers arrested him and forced him to recant his statement to Tasvir's lawyers. To that end, two local officers ordered Singh to sign, suspiciously enough, a couple of blank sheets of paper. One of the officers said to the other: "teach him a good lesson so

that he should learn what is the consequence of going against the police and say[ing] something against the police." The officers then ordered Singh to undress, slapped and punched him, kicked him in the chest, beat the soles of his feet with a stick, and urinated on him.

The next day, two senior police officers arrived to interview Singh. Before Singh met with them, a local officer instructed him about "how to speak before the senior officers," warning Singh: "if you don't help the police, then you . . . will also disappear, like Tasvir Singh forever." Singh then met with the two senior officers, along with one of the local officers. The senior officers had the two papers that Singh had signed the day before, but such papers now had "something written on [them]." Singh then recanted the statement he gave to Tasvir's lawyers. He told the senior officers that he "had never seen [Tasvir] in the cell" and that Tasvir "was a mentally weak person" that would leave home for days. As Singh later testified to the Immigration Judge ("IJ"), he gave "all these statements . . . to save [his] life . . . on the instructions of the police."

Singh was released, but his family and friends arranged for him to leave India. He entered the United States without inspection in November 2007, and he filed affirmative applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") in February 2008.

B

In October 2008, the Department of Homeland Security ("DHS") filed a Notice to Appear and initiated removal proceedings against Singh. Singh conceded his removability, but he renewed his applications for asylum, withholding of removal, and CAT protection.

Before the IJ, Singh sought to establish "refugee" status by showing past persecution on account of an imputed political opinion. *See* 8 U.S.C. § 1158(b)(1); *id.* § 1101(a)(42)(A). He argued that the Punjabi officers persecuted him because he spoke out "against police" and "against corruption." The IJ therefore evaluated his claim under the Board of Immigration Appeal's ("BIA") precedential decision in *Matter of N–M–*, which sets forth a three-factor standard to determine whether retaliation for "opposition to official corruption (or 'whistleblowing')" constitutes persecution on account of a political opinion. 25 I. & N. Dec. 526, 526 (BIA 2011). Under that decision, the IJ considers: (1) "whether and to what extent the alien engaged in activities that could be perceived as expressions of anticorruption beliefs," (2) "any direct or circumstantial evidence that the alleged persecutor was motivated by the alien's perceived or actual anticorruption beliefs," and (3) "evidence regarding the pervasiveness of government corruption, as well as whether there are direct ties between the corrupt elements and higher level officials." *Id.* at 532–33.

In Singh's case, the IJ found that he failed to satisfy each of these factors. First, he found that Singh's statement to Tasvir's lawyers could not reasonably be construed as "reflecting anticorruption beliefs," since Singh never "escalate[d] the situation to higher authorities" or "ma[de] his knowledge public." Second, he found that Singh's persecutors "act[ed] out of personal revenge" and not "with any particular concern about Singh's political beliefs." Finally, the IJ found that Singh's actions "threatened to expose [only] the corrupt acts of *rogue officials*," not a "scheme of corruption entrenched in the ruling party." Because the IJ concluded that Singh's mistreatment was not "on account of" his "imputed or actual anticorruption

beliefs," he denied Singh's application for asylum. The IJ also denied Singh's application for withholding of removal, reasoning that Singh's claim necessarily failed because the standard of proof for withholding of removal is more stringent than the standard for asylum.

On administrative appeal, the BIA "adopt[ed] and affirm[ed]" the IJ's decision in all respects. Like the IJ, the BIA concluded that Singh "did not establish a claim based on an actual or imputed anti-corruption political opinion (or 'whistleblowing')." The BIA dismissed Singh's appeal, and he now petitions this court for review.

II

Singh first asks us to hold that the BIA erred in dismissing his appeal of the IJ's denial of his application for asylum.

A

Singh begins with a broad challenge to the BIA's precedential decision in *Matter of N–M–*, arguing that it misconstrues the provisions of the Immigration and Nationality Act ("INA") that govern asylum claims. *See* 8 U.S.C. § 1158(b)(1)(B)(i). As discussed, such decision establishes a three-factor standard to determine whether "whistleblowers" can demonstrate persecution on account of a political opinion. *See Matter of N–M–*, 25 I. & N. Dec. at 526, 532–33. Singh claims that the agency's use of these factors saddles a "nebulous class of applicants" with a "uniquely onerous evidentiary burden." Singh asks us to hold that *Matter of N–M–* is an unreasonable interpretation of the INA, and therefore that the IJ's and BIA's reliance on such decision was legal error.

We decline Singh's invitation. Our cases recognize that whistleblowing "may constitute political activity sufficient to form the basis of persecution on account of political opinion." *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000); *see also Khudaverdyan v. Holder*, 778 F.3d 1101, 1106 (9th Cir. 2015). If "alleged corruption is inextricably intertwined with governmental operation," then "the exposure and prosecution of such an abuse of public trust is necessarily political"—even if the applicant does "not concomitantly espouse political theory." *Grava*, 205 F.3d at 1181. "[T]he salient question," we have reasoned, is whether the alien's "actions were directed toward a governing institution" or "against individuals whose corruption was aberrational." *Id.*; *see also Khudaverdyan*, 778 F.3d at 1106 (similar); *Fedunyak v. Gonzales*, 477 F.3d 1126, 1129 (9th Cir. 2007) (similar). In other words, while an alien's opposition to broad forms of governmental corruption may evince a political opinion, his opposition to isolated corruption or the abuses of rogue officials usually does not.

Our whistleblowing cases also reiterate that the crucial element of an asylum claim is the persecutor's motive. *Cf. Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014) (describing the "persecutor's motive" as "critical"). An alien must show "that the *persecutor* was *motivated* by a *belief* that the petitioner held the political opinion"— regardless of whether the victim actually held such an opinion. *Khudaverdyan*, 778 F.3d at 1106 (second emphasis added). Thus, our whistleblowing cases expressly state that "[p]urely personal retribution is . . . not persecution on account of political opinion," although the presence of mixed motives does not defeat an applicant's claim for asylum. *Grava*, 205 F.3d at 1181 n.3; *see also Fedunyak*, 477 F.3d at 1129–30.

We think *Matter of N–M–* is consistent with these cases. For the first factor, IJs may evaluate whether an alien's actions "could be perceived as expressions of anticorruption beliefs." *Matter of N–M–*, 25 I. & N. at 532. "For example, an [IJ] may consider whether an alien denounced corruption in public or at work, published articles criticizing governmental corruption, or organized fellow victims . . . ." *Id.* Such facts bear on whether the persecutors believed that the alien harbored an anti-corruption political opinion. *Cf. Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir. 2004) (applicant published a newspaper article criticizing a corrupt government official), *overruled on other grounds by Maldonado v. Lynch*, 786 F.3d 1155 (9th Cir. 2015); *Baghdasaryan v. Holder*, 592 F.3d 1018, 1021 (9th Cir. 2010) (applicant organized a rally with one hundred business owners to expose a public official's corruption).

*Matter of N–M–*'s second factor addresses the "critical" issue in asylum cases: the "persecutor's motive." *Garcia-Milian*, 755 F.3d at 1031; *see Matter of N–M–*, 25 I. & N. at 532. This factor ensures that the official harmed the victim *because of* his political opinion—not to line the official's pockets, to avenge his wounded pride, or to seek "personal retribution." *Grava*, 205 F.3d at 1181 n.3. And third, *Matter of N–M–*'s last factor instructs IJs to determine "the pervasiveness of government corruption" and any "direct ties between the corrupt elements and higher level officials." 25 I. & N. Dec. at 533. This factor instructs IJs to ask the "salient question" in a whistleblower case: whether the alien's actions were "directed toward a governing institution" or against "aberrational" corruption. *Khudaverdyan*, 778 F.3d at 1106 (quoting *Grava*, 205 F.3d at 1181).

Because *Matter of N–M–*'s three factors correspond to those in our own whistleblowing cases, we cannot say that the BIA's interpretation is *unreasonable*. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[T]he BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication . . . ." (internal quotation marks omitted)).

B

Singh next argues that, even if *Matter of N–M–* passes muster, he satisfied each of that decision's three factors. He claims, therefore, that the record compels a conclusion that the Punjabi officers persecuted him on account of his imputed political opinion.

Once again, we disagree. The BIA concluded—based on the IJ's factual findings—that Singh's statement to Tasvir's lawyers "could not reasonably be construed as an expression of anticorruption beliefs," as he never "report[ed] the corruption" to higher officials or sought to "make his knowledge public." Given Singh's failure to take concrete steps to expose corruption, the BIA could reasonably conclude that Singh never formed a bona fide political opinion about corruption in the ranks of the Punjabi police. Instead, the officers likely thought that Singh's actions manifested an apolitical desire to help Tasvir—not general anti-corruption sentiments. And even assuming that Singh might have formed (or that the officers *believed* he formed) some political opinion, the BIA concluded that the record supported the IJ's finding that the officers' motivations had nothing to do with such opinion. In the BIA's view, the officers acted out of "personal revenge" because his statement "implicat[ed] them in [Tasvir's] disappearance" and "expose[d] their misdeeds." From the officers'

perspective, in other words, Singh's political views were irrelevant.

Singh responds that "direct evidence" demonstrates that the officers targeted him for his "anti-police views." Specifically, Singh notes that the officers accused him of "going against the police and say[ing] something against the police." But in context, this statement is at best ambiguous; it could perhaps suggest that the officers imputed to Singh certain political views, but it could just as easily indicate general displeasure with the inconvenience caused by Singh's testimony. We do not think that the officers' isolated, equivocal statements *compel* a conclusion contrary to the BIA's. *See Garcia-Milian*, 755 F.3d at 1032–33 (upholding the BIA's decision despite a "single statement" in the record that arguably contradicted its decision). Singh's claim for asylum therefore fails.

## III

Singh next argues that the BIA erred in dismissing his appeal of the IJ's refusal to withhold removal. He claims that the BIA failed to follow *Barajas-Romero v. Lynch*, which held that applicants for withholding of removal must meet a "less demanding" nexus standard than those seeking asylum. 846 F.3d 351, 360 (9th Cir. 2017). Specifically, an applicant for withholding must show that his political opinion was "a reason" for his persecution, while an applicant for asylum must show that it was "one central reason." *Id.* According to Singh, the BIA erred because it applied the "one central reason" standard for *both* of his claims, and he thus asks us to remand to the BIA with instructions to apply the correct legal standard.

Although we agree that the BIA incorrectly applied the "one central reason" standard, we need not remand the case.

Because the BIA adopted the IJ's finding of *no* nexus between the harm to Singh and the alleged protected ground, neither the result nor the BIA's basic reasoning would change. Accordingly, remand to the BIA "would be an idle and useless formality," and we will not "convert judicial review of agency action into a ping-pong game." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969). Therefore, Singh's challenge to the BIA's affirmance of the IJ's refusal to grant withholding of removal fails.[1]

## IV

The petition for review is **DENIED.**

---

[1] The BIA also affirmed the IJ's denial of Singh's request for CAT relief. *See* 8 C.F.R. § 1208.16(c)(3). The BIA concluded that Singh failed to "show that he more likely than not will be tortured if he returns home," *Singh v. Whitaker*, 914 F.3d 654, 663 (9th Cir. 2019) (internal quotation marks omitted), because he could "live elsewhere in India safely." Substantial evidence supports the BIA's conclusion.